UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-21783-CIV-SEITZ/SIMONTON


PRIDE FAMILY BRANDS, INC,

      Plaintiff,

v.

CARL'S PATIO, INC., CARL'S PATIO
WEST, INC., WOODARD-CM, INC., and
SCOTT COOGAN,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' SECOND AND FINAL MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendants Woodard-CM, LLC. ("Woodard")

and Scott Coogan's Second and Final Motion for Summary Judgment [DE 111] wherein Defendants

seek summary judgment on the remaining claims in this case.[1]  Pride and Woodard are competing

patio furniture manufacturers.  Pride alleges Woodard infringed its unregistered trade dress by

copying the design of Pride's Coco Isles and Cabana Bay furniture collections in a confusingly

similar product line Woodard calls Jumby Bay.  Pride claims that Woodard's copying violated §

43(a) of the Lanham Act (Claim II).  Pride has also asserted common law claims for Unfair

Competition (Claim III) and Unjust Enrichment (Claim IV), and a Florida statutory claim of

Deceptive Acts and Practices (Claim V).[2]

---

[1] The Court previously granted summary judgment for Defendants on Plaintiff's claim of design patent infringement (Claim I). [DE 132].

[2] Though Defendants also seek the entry of summary judgment as to Defendant Coogan on legal grounds of individual non-liability, the merits of that argument are not reached because summary judgment is granted for both Defendants on other grounds.  Defendants also seek a finding under 15 U.S.C. § 1117 that the action qualifies as an "exceptional case" which if granted would entitle Defendants to its attorney's fees.  That issue is not reached here because an Order to Show Cause on the imposition of sanctions is forthcoming.

1

Having considered the motion, Pride's opposition [DE 121], and the reply [DE 130], summary judgment must be granted for Defendants. When the record evidence is viewed in the light most favorable to Pride, it cannot prevail on its trade dress infringement claim for three, separately dispositive reasons. First, the record evidence overwhelmingly shows that Pride's trade dress is functional and therefore not protectable. Second, the record evidence fails to demonstrate that either Pride collection achieved secondary meaning. Finally, there is no evidence that the relevant customers were likely to confuse Pride's and Woodard's collections. Because Claims III, IV, and V are predicated on Pride alleging a viable trade dress infringement claim, summary judgment must also be granted on those claims.

## BACKGROUND[3]

### a. Business Backdrop of the Dispute

Coco Isles, Cabana Bay, and Jumby Bay are each patio furniture collections in a tropical motif.[4] Defendant Scott Coogan designed all three collections. Coogan worked for Pride between 2004 and 2006 and joined Woodard in 2010. Pride contends that the Jumby Bay designs "are substantially identical and confusingly similar to the designs of the corresponding pieces of the [Coco Isles and Cabana Bay] collection[s]." [DE 6, ¶ 23].[5]

For several years Pride sold the Coco Isles and Cabana Bay collections to an outdoor furniture retailer called Carl's Patio ("Carl's"). In October or November 2011, Carl's decided to carry Woodard's Jumby Bay line and stopped buying Coco Isles or Cabana Bay. The patio furniture

---

[3] Unless otherwise noted the facts are taken from the undisputed record evidence.

[4] The collections include chairs, bar stools, sofas and love seats, dining tables, occasional tables, and ottomans. According to Plaintiff's CEO Steven Lowsky, Cabana Bay differs from Coco Isles in that the tubing used in Cabana Bay's frames is larger, Cabana Bay has a more nautical feel, and that Cabana Bay was intended for a different audience. (Deposition of Steven Lowsky, DE 111-4, 196:4-8).

[5] It is undisputed that Woodard brought certain pieces of Coco Isles furniture to its factory in Michigan when it fabricated its Jumby Bay prototypes. Woodard's chief engineer Reed Stauffer testified in his deposition that Woodard brought the Coco Isles pieces to its factory to ensure that the products Woodard was making surpassed Pride's comfort level. (Deposition of Reed Stauffer, 130-2, 71:8-18).

2

business is competitive. It is commonplace for manufacturers to involve large retailers in the design phase to ensure that new collections will sell. (Deposition of Greg Ecoff, DE 111-12, 74:5-17). Sometime after November 2010, when Coogan joined Woodard, Woodard approached Carl's with the prototype for its Jumby Bay collection. Carl's directed Woodard to change its designs to add lashing and flare the chairs' armrests. Woodard made the changes. Carl's bought Jumby Bay and abandoned Coco Isles and Cabana Bay. Pride now alleges that Defendant Coogan and Woodard conspired with Carl's to produce a cheaper "knock off" of Coco Isles and Cabana Bay.[6]

### b. The Claimed Trade Dress

Trade dress is the "the total image of a product and may include features such as size, shape, color or color combinations, textures, graphics, or even particular sales techniques." *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179 (11th Cir. 2002). Pride claims trade dress rights in an expansive, yet vague list of elements from the Coco Isles and Cabana Bay collections.[7] Pride marketed Coco Isles and Cabana Bay under three different brand names - Prestige, Castelle, and Expressions.[8] However, when Carl's displayed the collections in its stores, it displayed the pieces

---

[6] Plaintiff named Carl's Patio and Carl's Patio West as Defendants. The Carl's entities filed a suggestion of bankruptcy on February 27, 2013. [DE 40, 41]. The Court stayed the case against Carl's [DE 43] and required status reports on the bankruptcy to be filed every sixty days. Carl's filed its last report on July 1, 2013 wherein it advised the bankruptcy case would be resolved by a global settlement which the Bankruptcy Court would review later that month. Carl's has not filed an additional report since the one in July and no party has moved to lift the stay against Carl's.

[7] In its complaint Pride alleges that its "chair design," "leg ornamentation," "table and chair design," "arm wrapping," "paint finish," and "fabric" are protected trade dress. [DE 6, ¶ 19]. In a response to an interrogatory Plaintiff answered that its protected trade dress consists of "[f]abrication and design of the aluminum, including the curvature and the aluminum lashings as [sic] various points on the products as well as the frame finish and cushion design and color and the overall unique product design of the collection." [DE 111-2, ¶ 17]. Moreover, when asked in depositions what features of the Coco Isles collection were distinctive Plaintiff's CEO Steven Lowsky responded "[i]t's got a very tropical feeling. It's got hand lashings in nine different areas. It's got a very plush, thick cushion. It's got great comfort. It's got a wonderful tortoise shell paint job." [DE 111-4, 192:12 -15].

[8] Carl's co-founder Gary Eckoff stated in his deposition that for a few years Carl's Patio put its own brand name on Pride's collections. [DE 111-12, pp. 89 – 90]. The record does not contain evidence of a consumer survey regarding consumer's association of any Pride brand to the Pride Family Brands company. [DE 111-19, ¶7]. However, in his deposition, Gary Ecoff stated that a study Carl's Patio commissioned regarding brand recognition in the patio furniture industry generally found very little brand recognition in industry. Only one manufacturer, Brown Jordan, had achieved recognition of over 3%, the statistical relevance threshold, and even then, Brown Jordan's

only with Carl's Patio hangtags and not with tags that had any brand identifier. With respect to the color or color combinations, Pride's offerings are highly customizable. Depending on collection and piece, retailers could choose up to seventeen different frame finishes and nineteen different fabrics. [DE 111-11].

Certain design elements are common to the tropical genre. [DE 111-12, pp. 83 – 84]. These include the use of brown and beige finishes, natural fabric colors, cast embellishments that resemble bamboo nodes, and lashings. Such elements intended to evoke bamboo and rattan, materials that furniture in the tropics is traditionally made from. (*See* Deposition of Paul Otowchits, DE 111-16, 82:10-22). The record evidence includes photographs of outdoor furniture collections by Tommy Bahama [DE 111-8], Lane Venture [DE 111-3], and Lloyd Flanders [111-10]. Many of these design elements are present in the collections of those manufacturers.

### c. *Relevant Market Factors*

Pride's customers are furniture retailers. (Deposition of Steven Lowsky, DE 111-4, 218:4-8). Pride markets its collections at industry-wide trade shows in Chicago in July and September. (Deposition of Gary Ecoff, DE 111-12, 125:7-10). Like other players in the casual furniture industry, Pride displays its collection in large showrooms it leases at the Chicago Merchandise Mart. Buyers for retailers walk through the showrooms to view a particular manufacturer's collection and are presented with the manufacturer's marketing materials and, on request, its price lists. Pride also markets its furniture by using sales representatives to call on retailers at their stores. Retailers are aware that a manufacturer's representative only sells the manufacturer's products. [DE 111-4, 218:4-9].

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

recognition was only 3.5%. [DE 111-12, pp. 88 – 89].

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

Summary Judgment must be granted for Defendants on Plaintiff's trade dress infringement claim (Claim II) because when the record evidence is viewed in the light most favorable to Plaintiff, it does not support that there is a disputed material issue of fact as to whether (i) Plaintiff's trade dress is non-functional and therefore protectable; or whether (ii) Plaintiff's trade dress had acquired secondary meaning; or whether (iii) Defendant's products were likely to cause confusion in the market as to their designation of origin. Because the remaining claims - Unfair Competition (Claim III), Unjust Enrichment (Claim IV), and Deceptive Acts and Practices (Claim V) – are each factually predicated on the viability of its trade dress infringement claim, summary judgment must also be granted as to those claims.

## III.  TRADE DRESS INFRINGEMENT

Plaintiff alleges that the design elements of its products constitute protected trade dress. Where a plaintiff alleges a defendant infringed its trade dress by copying designs rather than packaging, the claim can only go forward if the plaintiff shows the claimed design elements are non-functional and have secondary meaning such that they identify the producer. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205 (2000). Once the plaintiff has established that its design constitutes protectable trade dress, it still must show that customers are likely to confuse the defendant's

5

products for their own to prevail. *Dippin' Dots, Inc. v. Frosty Bites Dist., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004). Each of these is a "threshold" element. *Id.* Therefore, Plaintiff's inability here to show a genuine factual dispute in record evidence as to non-functionality, secondary meaning, or market confusion means its trade dress claim fails thrice over.

### a.   The Claimed Elements are Functional

Because Pride does not own a registered trademark for the Coco Isles of Cabana Bay designs, pursuant to 15 U.S.C. §1125(a)(3), it has the "burden of proving that the matter sought to be protected is not functional." There are two categories of functionality. *Dippin' Dots, Inc.*, 369 F.3d at 1203. First, an element is functional if "it is essential to the use or purpose of the article . . . or affects the cost or quality of the article[.]" *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995). Second, under the doctrine of aesthetic functionality, an element is functional if its "exclusive use . . . would put competitors at a significant non-reputation-related disadvantage." *Id.* As such, courts look to the whether a competitor necessarily needs to use the claimed dress to compete in the field. *See Dippin' Dots, Inc.*, 369 F.3d at 1204, n. 7 ("Likewise, the color, shape, and size of dippin' dots are 'aesthetic functions' that easily satisfy the competitive necessity test because precluding competitors like FBD from copying any of these aspects of dippin' dots would eliminate all competitors in the flash-frozen ice cream market, which would be the ultimate non-reputation-related disadvantage."). The record evidence overwhelmingly supports that Plaintiff's trade dress is functional under the doctrine of aesthetic functionality. [9],[10]

---

[9] One of the claimed elements, a lashing that connects the leaf to the arm of the Coco Isle chair is essential to the construction of the chair as Plaintiff's CEO even conceded and it is therefore functional under the first category. [DE 111-4, 185:11-21.]

[10] Despite carrying the burden to prove its trade dress is non-functional, Plaintiff's opposition brief inexplicably ignores that requirement. In lieu of addressing Defendant's argument that Plaintiff's trade dress is functional, Plaintiff, at considerable length, argues that Defendants copied its designs. In so doing, Plaintiff has put the cart before the horse. Until Plaintiff shows its trade dress is protectable, Woodard, or anyone else, would be free to copy Plaintiff's claimed trade dress. *See TraFix Devices, Inc. v. Mkt'g Displays, Inc.*, 532 U.S. 23, 29 (2001) ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it

The design elements Plaintiff seeks to claim as protected trade dress are common to the tropical motif. Plaintiff claims, *inter alia*, that its "chair design," "leg ornamentation," "table and chair design," "arm wrapping," "paint finish," "fabric," and "lashings" are protected trade dress. The tropical motif is referential of rattan and bamboo furniture of the tropics and, among other features, includes curving, naturalistic frame forms, fabrics in natural colors like brown and beige, and cast ornament applications meant to resemble natural features in bamboo. It is well-documented in the record that Plaintiff is simply one of many producers of tropical furniture that currently uses these techniques. For example, Tommy Bahama's Hibiscus Grove Collection uses natural, undulating frame forms and cast bamboo knots. Lane Venture's Summer Porch and Transitions Collection each incorporate lashings. Lloyd Flanders's "cane" and "penshell" finishes are brown and mahogany respectively.

If Plaintiff were granted the sweeping trade dress protection it seeks, all other manufacturers would be foreclosed from utilizing curving, naturalistic frame forms, natural color fabrics, cast ornamental applications that simulate natural features in bamboo, simulated lashings, or finishes evocative of tropical materials. Granting Plaintiff a monopoly on these features would put competitors in the tropical patio furniture industry at a significant non-reputation-related disadvantage. Therefore, applying the comparative necessity test, these elements are functional. Consequently, summary judgment must be granted for Defendants.

### b. There is No Record Evidence of Secondary Meaning

Assuming that Plaintiff could have shown its claimed trade dress was non-functional, it would also have to show its trade dress has achieved secondary meaning.[11] Secondary meaning is

---

will be subject to copying.").

[11] A producer seeking trade dress protection must prove its product is distinctive. *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012). Previously, a producer could prove distinctiveness either by showing its product to be inherently distinctive or upon showing it had achieved secondary meaning. However, in *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205 (2000), the Supreme Court held a product's design could never be inherently distinctive and therefore, a producer seeking trade dress protection

acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n. 11 (1982).   Whether a product has established secondary meaning is a question of fact.  Here, the record does not contain direct evidence that the claimed design elements of Coco Isles or Cabana Bay had achieved secondary meaning, nor can such a finding be made by simple inference.

The burden to establish that a product achieved secondary meaning lies with the Plaintiff. *Gift of Learning Foundation Inc. v. TGC, Inc.*, 329 F.3d 792 (11th Cir. 2003).   The Eleventh Circuit's predecessor court indicated that the best way for a plaintiff to prove its product has achieved secondary meaning is survey evidence.   *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir. 1970)[12] ("The chief inquiry is the attitude of the consumer toward the mark; does it denote to him a, 'single thing coming from a single source?' Short of a survey, this is difficult of direct proof.") (internal citation omitted).  The record contains neither consumer survey evidence nor other direct evidence probative of secondary meaning such as testimony from consumers attesting to their recognition that the collections' designs are associated with Pride Family Brands.[13]

Where a Plaintiff cannot marshal direct evidence of secondary meaning, secondary meaning can still be proven by inference, but the burden is high.  For evidence that a product has attained secondary meaning the Eleventh Circuit looks to: 1) the length and manner of the product's use; 2)

---

needed to show secondary meaning. *Id.* at 216.  Plaintiff's opposition overlooks the *Wal-Mart* rule and argues, erroneously, that Plaintiff's designs are entitled to trade dress protection by virtue of inherent distinctiveness.  [DE 121, pp. 5 – 6].

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[13] To the extent that the record evidence contains statements by Plaintiff's principals testifying to Pride's products' superior quality or innovation, those statements are insufficient to raise a genuine disputed issue for trial.  Plaintiff's obligation is to show proof that "establishes the public mind" as to whether its products are associated with their producer. *Aloe Creme Labs., Inc.* 423 F.2d at 849.  As such, Plaintiff cannot rely on self-serving statements made by a principal regarding his own impressions of Pride's products, their renown, or reputation as these assertions are non-probative of the public mind.

the nature and extent of advertising and promotion; 3) the efforts made by plaintiff to promote a conscious connection in the public's mind between the trade dress and plaintiff's business; and 4) the extent to which the public actually identifies the name with plaintiff's goods and services. *Gift of Learning Foundation, Inc.*, 329 F.3d at 800. An inference of secondary meaning cannot be drawn from this record evidence.

First, the length and manner of use factors strongly cut against a finding of secondary meaning. The Coco Isles collection had been on the market for ten years, Cabana Bay for nine. In that time Carl's Patio sold both, but when Carl's displayed the furniture, it affixed its own hangtags. Despite the overall design, a Carl's customer would likely, and reasonably, believe, that Carl's made the furniture; very little, if anything, indicates Pride Family Brands actually manufactured it. Because Pride enabled its retailer customers to customize frame finishes and fabrics to their liking, offering as many as seventeen different finishes and nineteen different fabrics depending on collection and piece, it is even less likely that customers could identify a particular piece as being a Pride product based on its design elements alone.

Skipping for the moment the second factor and turning to the third, Pride's efforts to draw a connection between its trade dress and its business, by offering its collections under three separate brands, Plaintiff has made it less likely that a given customer would link Pride furniture's trade dress with its Pride Family Brands origin. For example, a customer who bought a Coco Isles chair under Castille brand and knew Castille to be associated with Pride Family Brands, might see the same chair at different retailer but sold under the Prestige brand. This customer would be less likely to associate the Prestige brand chair with Pride, than if Pride had uniform branding.

The second factor, advertising and promotion, and the fourth factor, extent of actual identification, are not useful to the analysis because the record evidence is insufficient to draw any

9

meaningful conclusions about secondary meaning.[14]   Given that Plaintiff cannot show its claimed

trade dress achieved secondary meaning summary judgment must be granted for Defendants.

### c.   There is No Record Evidence of Product Confusion

Assuming further still that non-functionality and secondary meaning had been established,

the entry of summary judgment for Defendants  would nonetheless be required for a third reason –

the record evidence does not support a finding of customer confusion based on Woodard's using

similar trade dress.  In the Eleventh Circuit, courts must weigh each of the following seven factors to

determine if a consumer is likely to be confused by similarity in the parties' trade dress:   (1) the

strength of the trade dress, (2) the similarity of design, (3) the similarity of the product, (4) the

similarity of retail outlets and purchasers, (5) the similarity of advertising media used, (6) the

defendant's intent, and (7) actual confusion. *AmBrit, Inc. v. Kraft Inc.*, 812 F.2d 1531 (11th Cir.

1986).  Of these seven factors, the first, strength of trade dress, and last, actual confusion, are the

most important. *Star Steakhouse and Saloon, Inc. v. Lone Star Steakhouse & Saloon of Georgia,*

*Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997).  The burden of showing confusion is on the Plaintiff.

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000).[15]   The seven factors are discussed

out of order.  Factors one and seven are discussed first, factors three, four, five, and two are discussed

next, and factor six is discussed last.

---

[14] Pride's collections were pictured in sales catalogs the company produced at an annual cost of $75,000 and also in
the magazines Hearth & Home, Casual Living, Luxe, and Florida Design.  With respect to the catalog expenditures,
the relevant inquiry is not how much Plaintiff spent on advertising, but how effective it was in fostering a
consciousness of origin. *Aloe Creme Labs., Inc.* 423 F.2d at 850 (5th Cir. 1970).   There is no record evidence to
suggest what, if any, affect the catalogs had on the public, nor is there any objective evidence from which to infer
what that impact might have been.  The record is silent as to how many catalogs were produced, where they were
distributed apart from the trade shows, to whom they were distributed, and how they were distributed.  Similarly,
there is insufficient evidence as to the distribution of Hearth & Home, Casual Living, Luxe, and Florida Design
magazines to make any reliable conclusions.  There is no record evidence concerning how frequently the collections
were advertised or the extent to which the advertisements linked either the Coco Isles or Cabana Bay collections to
Pride Family Brands.  With respect to the fourth factor, evidence of actual identification of the manufacturer by the
public based on the mark, there is no evidence in the record that would support such a conclusion.

[15] Plaintiff claims Defendant carries the burden on likelihood of confusion.  [DE 121, p. 6].  Plaintiff seems to have
overlooked that when the Federal Circuit reviews Lanham Act claims it applies the law of the regional circuit in
which the claim originated. *CPG Prods. Corps. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1011 (Fed. Cir. 1985).
As such, Eleventh Circuit law, not the Second Circuit case law on which Plaintiff has relied, controls.

### i.   Factors One and Seven

Strong trade dress indicates the product's source.  For example, by observation of just the Coca Cola contoured bottle, a consumer knows the origin of that soda.  *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749 (6th Cir. 1998).  It follows that where a product has a strong trade dress and a rival appropriates it, the consumer is more likely to be confused as to the rival product's origin.  Turning to Pride's claimed trade dress, it is apparent that is not the case here.  As discussed above in relation to secondary meaning, the features Pride claims as trade dress are generic aesthetic elements of the tropical motif.  There is no evidence from which to conclude that if a hypothetical consumer saw an unlabelled Coco Isles or Cabana Bay furniture piece he would recognize, based on its design alone, that it was made by Pride.

Nor is there any evidence that any actual consumer has mistaken a Jumby Bay piece for one made by Pride.  Plaintiff claims that "there was definitely confusion on the part of the consumer" and cites to the deposition of CEO Steve Lowsky for factual support.  [DE 121-1, ¶ 2].  Lowsky discusses two instances from Pride's investigation, but neither amounts to actual consumer confusion.  [DE 111-4 199:5-10; pp. 197 – 198].  In the first instance, a Pride investigator posed as a consumer and was told by different retailers that Jumby Bay furniture was better and cheaper than Coco Isles or was told that Pride could no longer supply the store.  In the second instance, a retailer in New York called Lowsky to report that a Woodard salesman offered to sell him a "Coco Isle look-alike."  Neither of these is evidence of actual confusion by a consumer based on Woodard's use of similar trade dress.  As such, the seventh prong counsels against a finding of consumer confusion.

### ii.   Factors Two, Three, Four, and Five

Trade dress cannot be viewed in a vacuum.  How the trade dress functions in the market place is an important consideration in determining market confusion.  *See e.g., Dippin' Dots, Inc.*, 369 F.3d at 1028 (11th Cir. 2004) (Noting that design similarity increased likelihood of confusion because ice cream novelties are impulse items, sold to hurried shoppers.); *Gray v. Meijer, Inc.*, 295

F.3d 641 (6th Cir. 2001) (Finding a low likelihood of confusion between store brand popcorn and national brand popcorn with similar labels because store brand popcorn was on a shelf with other store brand snack food.) Thus, when evaluating factors two, three, four, and five - similarity of design, similarity of the product, similarity of retail outlets and purchasers, and similarity of advertising media used - the way the trade dress actually works in the market influences each facet of the analysis.

Factors three, four, and five, do not strongly favor a likelihood of confusion. Factor three considers the similarity of the product. Here, the products are both outdoor furniture collections in the tropical motif. Similarly, the record evidence as to the fourth factor, similarity of retail outlets and purchasers, shows both Pride and Woodard sold their collections to the same customers, outdoor furniture retailers including Carl's Patio. The record evidence is insufficient to draw any conclusions as to factor five, the similarity of Pride's and Woodard's advertising.

The second factor, similarity of design, strongly *disfavors* that there was confusion between Plaintiff's and Woodard's collections. Plaintiff alleges that Woodard's Jumby collection is identical in every way to Plaintiff's Coco Isle and Cabana Bay collections.[16] Even if it were assumed that Woodard's and Plaintiff's collections were identical, the Eleventh Circuit requires that similarity of design is evaluated in the "context of the trade dress as whole." *AmBrit, Inc.,* 812 F.2d at 1540. Here, the way the collections are marketed makes confusion between the two highly unlikely. Pride sells its furniture exclusively to retailers.[17] As industry participants, retailers are a sophisticated

---

[16] Plaintiff does not address the apparent logical inconsistency of its position given that Plaintiff's CEO explained that Cabana Bay is different from Coco Isles in that it is made from larger tubing, has a more "nautical feel," and was designed to appeal to a different customer.

[17] Even if the relevant customer demographic for the confusion analysis were end-use consumers, the likelihood of confusion is low. First, as is noted elsewhere, brand recognition in the patio furniture industry is low. Steven Lowsky stated in his deposition that the most important factors in a customer's buying decision were price, comfort, and appearance. This suggests that a consumer does not make purchasing decisions based on brand. Second, outdoor patio furniture is not an impulse item. The record evidence shows that outdoor furniture pieces can retail for more than $1,000 dollars. So while Pride and Woodard might be considered by the same end-user, a consumer looking for Pride-made furniture would likely undertake some investigation given what the product costs.

customer base who, it can be assumed, know the different market players and are familiar with developments in designs and changes in pricing.  The marketing channels in the patio furniture industry are well-established.  Manufacturers, including Pride, show their collections at twice-yearly trade shows, a pre-show in July and a main show in September.  Pride leased large display showrooms at these trade events where only its collections were displayed.  Additionally, a manufacturer might send a sales representative to call on a retailer customer.  Sales representatives only sold one manufacturer's line of furniture.  As Steven Lowsky testified, "you know when a sales rep walks in from Woodard, he's selling Woodard product." [DE 111-4, 218:4-9].

### iii.    Factor Six

Finally, the sixth factor considers a defendant's intent in co-opting Plaintiff's trade dress. Plaintiff has vigorously argued that Defendants Coogan and Woodard copied Pride's designs, not just to capitalize on Pride's goodwill in the industry, but out of bad faith.  Jamie Lowsky, Pride's President, goes so far as to state in his deposition that Coogan was "so hateful of Pride that no matter where he went he was vengeful to come after us . . ." (Deposition of Jamie Lowsky, DE 61, 94:1-10). Lowsky's speculations as to Coogan's motives are unsupported by the record evidence.  Moreover, though Pride reads Woodard's successful effort to displace Pride's collections in the market as evidence of bad faith, the record evidence supports a finding that Woodard engaged in *fair* competition.

The Supreme Court recognized in *TrafFix Devices, Inc. v. Mkt'g Displays, Inc.*, 532 U.S. 23, 29 (2001), that in the trade dress realm "in many instances there is no prohibition against copying goods and products."  This is especially true where the claimed trade dress is the product's design. As the Court explained: "Allowing competitors to copy will have salutary effects in many instances. Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *Id.* (internal quotation marks and citation omitted).

Woodard developed the Jumby Bay line in consultation with Carl's, who previously bought

13

Pride's collections. Woodard changed its prototype designs based on Carl's recommendation to add lashings and to flare the chair arms. As is discussed above, Pride does not have a monopoly on the application of lashing or any other generic element of the tropical motif. Without more, Woodard's efforts to reengineer products to conform to a customer demands cannot be found to be a bad faith attempt to engage in deliberate confusion.

To the extent Plaintiff attempts to claim that Coogan's reservations about adding lashings are indicative of his knowledge that Woodard deliberately copied Pride's products for the purpose of confusing customers, Plaintiff overextends the record evidence. Coogan stated that he did not want to add lashings simply because he had done that before while designing for Pride. [DE 83-2, pp. 52 – 53.]. While Plaintiff seems to impute consciousness of guilt to that sentiment, Coogan's hesitance might equally be ascribed to a designer's desire not to tread ground he has already covered. Plaintiff also cites Woodard's use of a Coco Isles chair in the development of the Jumby Bay collection. As noted above, reverse engineering is not uncommon is a valuable tool which often furthers competition in the marketplace. Here, Defendant's chief engineer Reed Stauffer testified Woodard's design team studied the Coco Isles chair in order to surpass its level of comfort. On balance, it is evident that the record evidence does not support Plaintiff's contention that defendants engaged in bad faith to the extent they incorporate elements of Plaintiff's trade dress. Overall, based on the record evidence, Plaintiff cannot show a likelihood of confusion in the minds of consumers between Jumby Bay and Coco Isles or Cabana Bay furniture. For this additional reason, summary judgment on Plaintiff's trade dress infringement claim must be entered for Defendants.

## IV.   THE REMAINING CLAIMS

None of Plaintiff's remaining claims, Common Law Unfair Competition (Claim III), Unjust Enrichment (Claim IV), and Unfair or Deceptive Acts and Practices (Claim V), allege any facts or injury independent of those related to Plaintiff's Patent Infringement (Claim I) and False Designation of Origin claims (Claim II). Because Defendant's did not infringe Plaintiff's design patents or trade

14

dress, these claims necessarily fail and summary judgment must be entered for Defendants on each claim.

## V.    CONCLUSION

Given that the record evidence fails to establish (i) that Plaintiff's trade dress is non-functional; (ii) that Plaintiff's products had achieved secondary meaning; (iii) and that Defendant's Jumby Bay collection would cause consumers to be confused about its designation of origin, based on the foregoing, summary judgment must be entered for defendant as to Claim I.  In light of this and the earlier finding that two of Plaintiff's design patents were invalid and Defendants did not infringe Plaintiff's valid design patents, summary judgment must be granted as to all remaining claims. Therefore, it is

ORDERED THAT

(1) Defendant's Second and Final Motion for Summary Judgment [DE 111] is **GRANTED**.

(2) **Except for Docket Entry 22**, Agreed Plaintiff's Motion to Seal DE 121 and Exhibits, which is resolved by separate Order, all pending motions are **DENIED AS MOOT**.

(3) The Court shall separately enter judgment following the resolution of the forthcoming Order to Show Cause.  [*See* DE 132, p. 1., n.1].

DONE AND ORDERED in Miami, Florida, this 29ᵗ day of January 2014.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    Honorable Andrea M. Simonton
       All counsel of record

15